Filed 2/24/23  P. v. Madrigal CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JAIRO GUADALUPE MADRIGAL,<br><br>    Defendant and Appellant. | F082856<br><br>(Super. Ct. No. F19903348)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found Jairo Guadalupe Madrigal guilty as charged of murder (Pen. Code, § 187, subd. (a)),[1] with two special circumstances: drive-by murder (§ 190.2, subd.

---

[1]    All further statutory references are to the Penal Code unless noted otherwise.

(a)(21)) and gang-related murder (§ 190.2, subd. (a)(22)). It also found true an alleged gang enhancement (§ 186.22, subd. (b)(5)), and a firearm enhancement for personal and intentional discharge of a firearm causing death (§ 12022.53, subds. (d), (e)(1)).[2] Madrigal was sentenced to an indeterminate term of life on the firearm enhancements followed by a term of life without the possibility of parole for special circumstance murder (§§ 187, subd. (a), 190.2, subd. (a)(21), (22), 12022.53, subds. (d), (e)). The gang enhancement was stayed.[3]

In his opening brief Madrigal contends: (1) the gang enhancement and gang-participation special circumstance must be reversed; (2) trial counsel provided ineffective assistance in failing to object to certain evidence during his contacts with law enforcement; (3) the probation fee imposed must be vacated; and (4) the trial court erred in imposing a $10,000 restitution fine. In supplemental briefing he contends that his murder conviction must also be reversed because the charge was tried jointly with the gang allegations. Respondent concedes that the gang allegations must be reversed, but not the underlying convictions, and concedes the probation fee must be vacated. We accept these concessions. In all other respects, we affirm.

## STATEMENT OF THE FACTS

On the evening of May 17, 2019, David Corona took his cousin Jennie Calderon's silver Mazda 6 to "run fluids through" the car and pick up a soda for her. Corona was a member of the Eastside Bulldog gang.

---

[2] Madrigal was tried with codefendant Daniel Solorio, who was found guilty of murder (§ 187, subd. (a)), and the gang enhancement (§ 186.22, subd. (b)) found true. Solorio was acquitted of firearm allegations and he pled guilty prior to trial to a misdemeanor count of destroying evidence (§ 135). Solorio has filed a separate appeal (case No. F083181).

[3] We note that the firearm enhancement is incorrectly listed on the abstract of judgment as stayed. We address this enhancement further in part I. of the Discussion.

Cesar Porras worked at the AM/PM convenience store and gas station on Cherry and Jensen. On the evening of May 17, 2019, a short dark-skinned Hispanic male wearing a red shirt, later identified as Corona, came in and bought a soda. A video of the station's gas pumps showed a GMC pickup stopped at a pump and two men get out and walk into the store. The two men, Madrigal, wearing a white shirt, and Solorio, wearing a dark blue shirt, were behind Corona as he was checking out. Solorio was described as skinny, with braces on his teeth, wearing a blue shirt and driving a truck. Porras recognized Solorio as someone who came into the store about three times a week to get gas.

As Corona left the store, Madrigal lifted his right hand and pointed at Corona. Corona left the store in the Mazda, heading north on Cherry Street. The two men then left in the truck and also drove north on Cherry Street.

Karina Nava was driving on Jensen toward Cherry Street when she saw a truck come up from behind at a high rate of speed. As she turned left on Church Street, Ruiz looked in her rearview mirror and saw a small car and the truck both turned right. The truck pulled up on the left side of the small light-colored car while driving on the wrong side of the road. The truck then made a U-turn and the small car veered to the side of the road.

Devonna Burrus was driving east on Church Street when she saw a champagne or tan-colored truck and a white car almost collide. The truck's windows were down and there were two males inside. The truck spun out of control and then took off; the car hit a light pole on Church Street in front of the Gables Motel. Burrus stopped to see if she could help. She saw the car's rear windows were shattered and the driver, with a bullet lodged in the back of his head, was nonresponsive. Burrus had not heard any gunshots.

Luis Martinez was in a vehicle with his wife traveling east on Church Street, when he heard two to three gunshots and then saw a Mazda, which was traveling in the same direction, in the intersection of Church Street and Sarah Avenue. After hearing the

3.

gunshots, Martinez saw a truck, which was traveling westbound on Church Street, make a U-turn on Sarah Avenue and continue eastbound.

Police Officer Jose Garcia was dispatched to the scene of the crash at approximately 7:00 p.m. He found a silver Mazda crashed into a pole at the intersection of Church Street and Sarah Avenue. The rear window of the driver's side was shattered, and the windshield broken. The driver, Corona, who was deceased, was bleeding from the back of his head, and officers found two .40-caliber shell casings near the crash side, one on the roadway and one on the curb.

Surveillance videos from several businesses enroute from the gas station show the front passenger window of the truck down and the passenger wearing a white T-shirt. A video from another business shows the truck traveling at a high rate of speed as it catches up and passes by the side on Corona's car. In the AM/PM video taken earlier, the front passenger window in the truck was up.

None of the videos showed the truck's license plate number. A subsequent search on a vehicle identifier service found a truck owned by Jose Solorio that matched the description. Jose Solorio testified that his son, Daniel, drove the truck.

Jose Solorio identified the man in the surveillance video wearing a dark blue shirt as his son, Daniel. An officer identified the man in the white shirt as Madrigal, who had light skin, a goatee, and was wearing a black backwards ball cap with the letter "P." Madrigal had visible tattoos on his left wrist, left forearm, and back of his right arm. It was discovered that Madrigal worked on the day of the shooting, from approximately 6:00 a.m. to 2:30 p.m., but that he did not work the following day.

Solorio and Madrigal were both arrested days later. Solorio was arrested as he was getting in his truck. A cell phone was found in the truck and text messages extracted from May 17-19, 2019, showed texts with "LBB" on them, Madrigal's nickname of "Little Bam Bam." On the evening prior to the shooting, Solorio texted "Danny NSL" "Me and Bam on our way."

4.

After the shooting, Solorio exchanged several messages with "Hoe 1". Solorio texted "Where the money, bro? I hella need some kind of money today." "Hoe 1" responded, "What happened to the 800, bro?" Solorio replied, "Some shit happened last night and I had to get rid of my truck and I need money, bro." Solorio sent "Hoe 1" a text message about a news story on the shooting of Corona. Solorio then texted, "Mother fuckers think they don't have to pay." "Hoe 1" replied, "Homeboy, what, you say you did that?" Solorio answered, "What you think, bro." "Hoe 1" asked, "Why did you do that?" Solorio replied, "Niggas think they don't need to pay homeboy. This shit ain't no game. Just because I don't live in the same town doesn't mean I won't look for whoever owes me. Feel me bro? Fuck that." "Hoe 1" asked, "Okay so what did you do with the truck?" Solorio answered, "It's gone bro, like completely ain't coming back at all."

Officers searched Solorio's residence and located a Pittsburg Pirates baseball cap that matched the cap worn by Madrigal in the AM/PM surveillance video. Officers found a gun case in the bedroom occupied by Solorio's brother, which contained a loaded gun magazine. Solorio's truck was swabbed, but the samples did not match Solorio or Madrigal. The only latent print identified belong to Solorio.

_Gang Evidence_

Oscar Torres, a senior investigator with the district attorney's office, testified as a gang expert that the Huron Parkside Norteños (HPN) is a subset of the Norteño gang in Fresno. As of May 17, 2019, HPN had at least 10 members. All of the Norteño subsets belong to the same gang, and all pay taxes passed on to the Nuestra Familia prison gang, at the top of the Norteño gang hierarchy. In Fresno, the Sureños and Bulldogs are both rivals of the Norteños.

     *1.     Predicate Offenses*

Police Officer Mark Wilcox testified as a gang expert, and described three predicate offenses committed by HPN gang members.

On January 1, 2015, Juan Orozco, an HPN, was convicted of murder with a gang enhancement. Officer Wilcox, who had had some contact with Orozco, opined that the crime was committed for the benefit of the gang. On October 18, 2012, Luis Solorio, an HPN and Solorio's uncle, was convicted of first-degree burglary. Wilcox opined that this crime benefited the gang because Luis Solorio stole an X-box and firearms, which are used by the gang. And on May 22, 2010, Iscander Madrigal, an HPN and Madrigal's older brother, was convicted of first-degree murder and active street gang participation.

    2.    *Prior Police Contacts with Madrigal*

Various officers testified to numerous instances of prior contact with Madrigal between 2009 and 2018.

On February 16, 2009, Huron Police Officer Jose Puga contacted Madrigal in the company of two other Norteño gang members, Ricardo Galvan and Raul Garza. Puga, who was familiar with all three, suspected Galvan and Garza of a probation violation.

On February 19, 2010, Coalinga Police Corporal Stephen Simons contacted Madrigal in the company of three other Norteño gang members, Ricardo Galvan, Carlos Morales and Luis Solorio.

On August 27, 2010, California Highway Patrol Officer Daniel Sanchez contacted Madrigal and Eduardo Velasquez, who was on probation. At the time, Madrigal had a single dot on the web of his right hand and four dots on the web of his left hand, which is a common Norteño tattoo representing the number 14.

On October 7, 2010, Huron Police Officer Santiago Jurado, Jr. contacted Madrigal and Eduardo Velasquez, both of whom were on probation. Madrigal was carrying a portable PlayStation that depicted, on the screen, a photograph of a coffin with a deceased Norteño surrounded by a group of Norteño gang members. Madrigal was arrested and transported to the police station. The officer noted a tattoo of four dots on the web of Madrigal's left hand and one dot on the web of his right hand.

On July 25, 2011, Officer Puga responded to a call that someone was brandishing a weapon. At the scene, he saw Madrigal and Ricardo Galvan coming towards him. The officer aimed his spotlight at them, they fled, but were eventually detained. Both Madrigal and Galvan were both active HPN members at the time. The following day, police found a shotgun in some bushes in the direction where Galvan had fled.

On May 7, 2012, Coalinga Police Officer Earl O'Neal responded to a report of gang members running through a park dressed in black and carrying a gun. Officers contacted Madrigal and two other Norteño gang members. Madrigal had visible gang tattoos and lifted his shirt to show the officer a large "XIV" tattoo on his chest, along with a Huelga bird, the symbol commonly used by the Norteño gang to show affiliation.

On May 24, 2012, Coalinga Police Officer Andrew Diaz conducted a probation search of Madrigal's residence and found 21 rounds of live shotgun shells in a bedroom closet, along with two red shirts that had the words "Nor Cal" on them.

On August 29, 2012, Lemoore Police Officer Jose Ambriz contacted Madrigal in a park. At the time, Madrigal was wearing a red shirt and a red baseball cap with the letter "N". He had dot tattoos on his hands and a Huelga bird and Roman numerals on his chest. The same officer again contacted Madrigal on September 29, 2012, and noticed the same tattoos, as well as the initials HPN. Madrigal admitted he was an HPN gang member.

On September 2, 2012, Lemoore Police Officer John Henderson contacted Madrigal at a convenience store. Madrigal was wearing a red hat and shirt and the officer noted his hand and chest tattoos. He also had a tattoo of "Bam" on his forearm.

On September 5, 2012, Huron Police Officer Jose Arciga contacted Madrigal, when he was a passenger in a car with several other gang members.

On September 7, 2012, Corporal Simons responded to a call of a man with a gun chasing another man down an alley. According to Officer O'Neal, there had been a shooting earlier that day at a known Norteño residence. Corporal Simons stopped a car

leaving the residence, and Madrigal was in the car seat along with three other Norteño gang members. A .38 revolver with five live rounds and a .45 pistol with six rounds were found in the glove box. O'Neal interviewed Madrigal at the station, and he admitted he was a Norteño gang member, and that he looked up to his brother, Iscander, a Norteño. Madrigal eventually admitted he knew the guns were in the glove box and he was arrested for possession of a firearm.

On October 18, 2012, Madrigal and Luis Solorio were identified in a surveillance video of a residential burglary.

On November 8, 2012, Sergeant Justin Vallin contacted Madrigal in a park in Lemoore. Madrigal was wearing a red NorCal T-shirt, red Converse and a San Francisco 49ers hat. Various gang tattoos were visible.

On June 21, 2013, Officer Wilcox contacted Madrigal in the company of three Norteño gang members. He was wearing a red T-shirt, a Baseball cap with red on it, and red shoes. He had the aforementioned gang tattoos, along with a tattoo on his left wrist that read, "Killa4ornia."

On August 16, 2014, Huron Police Officer Claudio Moreno saw Madrigal, who was under the age of 21 years at the time, coming out of a store with alcohol. He was with two other gang members and had an "N" tattooed on his leg.

On September 14, 2014, Officer Arciga heard gunshots in the area of a park and saw four men running away carrying another man who had been shot. Officers detained Madrigal and three other Norteño gang members. Madrigal yelled at the officers and was uncooperative, but admitted he was a northerner.

On May 18, 2018, Reedley Police Officer Tim Kelly responded to a call involving an armed robbery. The officer contacted Madrigal and Solorio. Both denied gang membership, but both had HPN tattoos on their stomachs. They were eventually released when not identified in an in-field lineup.

8.

In a YouTube video found on Solorio's phone, Madrigal and others sing a tribute to the HPN. The song, called "Parkside Hits," discusses shootings and murder and gives "shout outs" to fellow Norteños. In it, Madrigal references his violent tendencies and boasts, "They call me Little Bam." Another YouTube song was about disrespecting Bulldogs.

### 3. *Prior Police Contacts with Solorio*

Lemoore Police Officer Luke Tran worked at Lemoore High School from 2013 and 2016. During that time, he saw Solorio wearing a red rosary to school. Students were not permitted to wear red at school, so Norteño gang members often wore red rosaries.

On January 24, 2019, Investigator Oscar Torres contact Solorio in the company of another Norteño.

After Solorio's arrest in this case, officers took photographs of Solorio's tattoos, which included a "Fres Norte" tattoo on his upper chest and "HPN" on his stomach. An "H' was tattooed on Solorio's left wrist and an "N" tattooed on his right hand.

### 4. *Gang Expert Opinion*

Investigator Torres testified as a gang expert, and opined that both Madrigal and Solorio were HPN members.

Investigator Torres was given a hypothetical based on the facts of this case, and opined that the crime was committed in association with a criminal street gang since two gang members were acting together. Torres opined that the crime would benefit the gang by eliminating rival gang members and enhancing the gang's reputation. According to Torres, the Fresno Bulldogs outnumber the Norteños significantly and a crime such as this "sends a message to rivals that they're still here, they're still active and that they are not going away, that the war's still going on." Torres opined that "this promotes and furthers their gang because it helps with recruitment, it helps with operating more freely." Torres testified that violent acts discourage people from reporting crimes committed by the gang and discourages rival gang members from moving into their territory or

9.

otherwise threatening the gang's control. He also stated that the crime benefitted the specific gang members involved because "eliminating a rival gang member carries a lot of weight in that it gives that member a lot of respect because it's a tremendous – it's a very significant act."

**DISCUSSION**

I. GANG ALLEGATIONS

Madrigal makes two primary contentions related to the enactment of Assembly Bill No. 333 (Assembly Bill 333), which amended section 186.22 and added section 1109 (Stats. 2021, ch. 699, §§ 3, 5.) The new laws became effective January 1, 2022. (See Cal. Const., art IV, § 8, subd. (c)(1); Gov. Code, § 9600, subd. (a).) The first contention is that Assembly Bill 333's recent changes to section 186.22 require reversal of the gang enhancement and gang participation special circumstance. The second is that Assembly Bill 333 requires reversal of the entire judgment because the new section 1109, concerning bifurcation and severance, applies retroactively to his case.

*Assembly Bill 333*

A.      *Overview*

Section 186.22 prohibits unlawful participation in a criminal street gang, as set forth in subdivision (a), and includes sentencing enhancement provisions found in subdivision (b), which are at issue here. (*People v. Briceno* (2004) 34 Cal.4th 451, 460, fn. 7.)

A criminal street gang is "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).)

A " 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or

10.

conviction of" two or more offenses listed in section 186.22, subdivision (e), if such conduct occurred within certain time frames and under particular circumstances specified therein. (§ 186.22, subd. (e)(1).) This is commonly known as the "predicate offenses" requirement. (*People v. Navarro* (2021) 12 Cal.5th 285, 311.)

The gang enhancement provision applies only to gang-related crimes, meaning offenses "committed for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subd. (b)); accord *People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) The enhancement penalty further requires "the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

By the enactment of Assembly Bill 333, section 186.22 has new requirements for establishing liability under subdivision (b). (Stats. 2021, ch. 699, § 3.) As of January 1, 2022, predicate offenses must be shown to have "commonly benefited" the alleged gang, and the common benefit must have been "more than reputational." (§ 186.22, subd. (e)(1).) Currently charged offenses no longer qualify (*id.*, subd. (e)(2)), and at least one predicate offense must have been committed "within three years of the date the current offense is alleged to have been committed ..." (*id.*, subd. (e)(1)). Among other additional changes, the terms "benefit," "promote," "further," and "assist" are now defined to mean providing "a common benefit to members of a gang where the common benefit is more than reputational." (*Id.*, subd. (g).)

Assembly Bill 333 also added section 1109. (Stats. 2021, ch. 699, § 5.) The new statute provides, as applicable here:

> "(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows:

> "(1) The question of the defendant's guilt of the underlying offense shall be first determined.

"(2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence." (§ 1109.)

### B. *Retroactivity of Amendments to Section 186.22*

Section 3 states that no part of the Penal Code is retroactive "unless expressly so declared." However, in *In re Estrada* (1965) 63 Cal.2d 740, an amendment to a criminal statute was held to apply retroactively despite the Legislature's failure to expressly declare such an intent. (*Id.* at pp. 742-745.) The rationale for this outcome has come to be known as the "*Estrada*" rule. (E.g., *People v. Frahs* (2020) 9 Cal.5th 618, 624.) In brief, "[w]hen new legislation reduces the punishment for an offense, we presume that the legislation applies to all cases not yet final as of the legislation's effective date." (*People v. Esquivel* (2021) 11 Cal.5th 671, 673.) Because there is no clear indication of legislative intent for prospective-only application, we conclude the amendments to section 186.22 apply retroactively in this case.

The People appropriately concede Madrigal's argument for reversal of the gang enhancement. As discussed in their briefing, the trial evidence addressing the predicate offenses requirement, as chronicled above, was insufficient under the current version of section 186.22. "The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges." (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480; accord, *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822-823 & fn. 19.)

Although not mentioned by either party, we find that vacating the section 186.22, subdivision (b) gang enhancement would also undo the section 12022.53, subdivision (e)(1) firearm enhancement. However, because the jury found that Madrigal personally and intentionally discharged a firearm, causing death pursuant to section 12022.53,

12.

subdivision (d), Madrigal is still subject to the same consecutive 25-year-to-life sentencing enhancement.

Unlike section 12022.53, subdivision (e)(1), which requires a finding that a person "violated subdivision (b) of Section 186.22," section 12022.53, subdivision (d) does not require such a finding for the 25-year-to-life sentencing enhancement to apply. Under subdivision (d), a person who "personally and intentionally discharges a firearm" and proximately causes great bodily injury or death "shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." In contrast, subdivision (e)(1) applies to a principal only if *both* of the following are met: "(A) The person violated subdivision (b) of Section 186.22" and "(B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

Here, because Madrigal personally and intentionally discharged a firearm causing the death of Corona, the 25 year-to-life enhancement remains intact. (See *People v. Lopez* (2021) 73 Cal.App.5th 327, 347-348 (*Lopez*) [the firearm enhancements on two counts of murder where the jury found true that the defendant personally and intentionally discharged a firearm pursuant to section 12022.53, subdivision (d), which carry the same penalty, remain intact].)

C.    *Gang-Murder Special Circumstance Finding*

The changes wrought by Assembly Bill 333 also require that we vacate the gang-murder special circumstance findings in this case (§ 190.2, subd. (a)(22)). Section 190.2, subdivision (a)(22) requires proof beyond a reasonable doubt that the defendant "intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." The express reliance on the gang-murder special circumstance statute on the definition of a criminal street gang in section 186.22, means that appellant is entitled to the benefit of this change in the law as

to the special circumstance finding under section 190.2, subdivision (a)(22). (*Lopez, supra,* 73 Cal.App.5th at p. 347.)

Madrigal and the People disagree about whether Assembly Bill 333's amendments apply to the gang-murder special circumstance findings (§ 190.2, subd. (a)(22)). Madrigal contends they do; the People say they do not.

There is a split of authority on this issue. In *Lopez, supra,* 73 Cal.App.5th 327, the Second Appellate District, Division Eight, concluded "Assembly Bill 333's changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22" including section 190.2, subdivision (a)(22). (*Lopez, supra,* at p. 346.) Section 190.2, subdivision (a)(22) was enacted as part of Proposition 21, an initiative measure approved by the electorate in the March 2000 primary election. (*People v. Shabazz* (2006) 38 Cal.4th 55, 64-65.) Section 190.2, subdivision (a)(22) "makes first degree murder a capital crime if '[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, *as defined in subdivision (f) of Section 186.22,* and the murder was carried out to further the activities of the criminal street gang.' " (*People v. Lopez* (2022) 82 Cal.App.5th 1, 10.)

The Second Appellate District's *Lopez* opinion holds that because "the definition of a criminal street gang has been narrowed by Assembly Bill 333 and new elements added in order to prove a criminal street gang and a pattern of criminal activity," the requirements for proving a gang special circumstance under section 190.2, subdivision (a)(22) have likewise changed. (*Lopez, supra,* 73 Cal.App.5th at p. 347.)

In *People v. Rojas* (2022) 80 Cal.App.5th 542 (*Rojas*), review granted October 19, 2022, a divided panel in our district reached the opposite conclusion. The *Rojas* majority held that "[b]ecause Assembly Bill 333' takes away' from the scope of conduct that Proposition 21 made punishable under section 190.2," (*id.* at p. 555) it is "unconstitutional to the extent it would amend that initiative" (*id.* at p. 557).

14.

The *Rojas* majority relied on the fact that California voters restricted the Legislature's ability to amend the provisions of Proposition 21. The majority's reasoning was as follows: "While the Legislature was free to amend Proposition 21 ..., it could only do so with a two-thirds vote in each house. (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, ... § 39, p. 131.) Assembly Bill 333 did not comply with that requirement and therefore cannot amend Proposition 21." (*Rojas, supra,* 80 Cal.App.4th at p. 555.) In practical effect, *Rojas* holds that a special circumstance murder allegation under section 190.2, subdivision (a)(22) may be proven based on a different, less restrictive definition of a "criminal street gang" than is found in the current version of section 186.22. (See *Rojas, supra,* at p. 558 [holding Assembly Bill 333 does not alter the scope or effect of § 190.2, subd. (a)(22)].)

In *People v. Lee* (2022) 81 Cal.App.5th 232 (*Lee*), review granted October 19, 2022, Division Four of the Second District concluded Assembly Bill 333 does not unconstitutionally amend section 190.2, subdivision (a)(22). Focusing on the question of voter intent, the *Lee* court opined there is "nothing to suggest that the electorate intended to impose a time-specific incorporation of the term 'criminal street gang' in the gang-murder special circumstance statute." (*Lee, supra,* at p. 245.) Accordingly, *Lee* holds that the term " 'criminal street gang' as incorporated in the gang-murder special-circumstance statute was 'intended to conform at all times' and 'remain permanently parallel' to section 186.22." (*Ibid*.)

In *People v. Lopez, supra,* 82 Cal.App.5th 1, relying on *Lee*, a panel of justices from this district different from the one that decided *Rojas* rejected a similar argument that Assembly Bill 333 improperly amended the gang conspiracy statute, section 182.5, enacted as part of Proposition 21. The court determined there was no time-specific provision in Proposition 21 for section 182.5 as there was for other provisions of the criminal law. (*People v. Lopez, supra*, at pp. 23-24.) The court concluded, "[W]e agree with *Lee*'s conclusion that 'the electorate clearly knew how to express the intent to freeze

15.

a statutory definition,' " and "[t]he absence of such time-specific language in section 182.5 leads to our rejection of the People's claim." (*People v. Lopez, supra,* at pp. 24-25.)

The People submit that Assembly Bill 333's "amendment to section 186.22, subdivisions (e) and (f), appears to be an unconstitutional amendment to the gang-murder special circumstance created by the voters via Proposition 21." Although the People's respondent's brief was filed before *Rojas* was published, their argument tracks the rationale espoused by the *Rojas* majority. Likewise, the People claim there are now two statutory definitions of a "criminal street gang." Although the gang conspiracy statute incorporates the definitions set forth in section 186.22, subdivision (e) and (f), the People argue those references must be read to mean as the provisions existed prior to Assembly Bill 333.

The People urge us to adopt a view similar to that held in *Rojas*, while appellant, urges us adopt a view similar to the reasoning in *Lee*. Obviously, since both *Rojas* and *Lee* have been granted review by our Supreme Court, this issue has not been decided. We, however, agree with and endorse the reasoning of *Lee*. Applying that reasoning here, the section 190.2, subdivision (a)(22), special circumstance findings must also be reversed.

We strike the findings under section 190.2, subdivision (a)(22) as well, and remand the matter to afford the People the opportunity to retry these allegations under the current law.

### D. Section 1109

As noted, above, Assembly Bill 333 also added section 1109 (Stats. 2021, ch. 699, § 5) to the Penal Code. Section 1109, subdivision (a) provides that, as applicable here, that upon request by the defense, a gang enhancement charged under subdivision (b) shall be tried separately after determination of the defendant's guilt of the underlying charge.

In supplemental briefing, Madrigal argues that the bifurcation requirement created by section 1109 applies retroactively to his conviction, which is not yet final. He further argues that the failure to bifurcate requires that we reverse the entire judgment so that his charges may be tried in a bifurcated proceeding in which the jury will first deliver a verdict on the underlying charges without being exposed to the evidence relating to the gang enhancements. The People disagree on both points.

As our Supreme Court has recently noted, case law is split on the question of whether section 1109 applies retroactively to convictions that are not yet final. (*People v. Tran* (2022) 13 Cal.5th 1169, 1208 (*Tran*).) Some published opinions have held that section 1109 is not retroactive. (See, e.g., *People v. Boukes* (2022) 83 Cal.App.5th 937, 948 [majority holding § 1109 is not retroactive; concurrence holding it is retroactive], review granted Dec. 14, 2022, S277103; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 [same], review granted Aug. 17, 2022, S275341; *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090). Other published opinions, including our own, have held that section 1109 is retroactive. (See, e.g., *People v. Montano* (2022) 80 Cal.App.5th 82, 108; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1130; *People v. Burgos* (2022) 77 Cal.App.5th 550, 564-569 [majority holding § 1109 is retroactive; dissent holding it is not retroactive], review granted July 13, 2022, S274743.)

In *Tran*, our Supreme Court found it unnecessary to take a position on whether section 1109 applies retroactively to convictions that are not yet final, as any error in failing to bifurcate the trial of the gang enhancements was harmless. (*Tran, supra,* 13 Cal.5th at p. 1208.) As we will explain, we take the same approach here.

Even assuming without deciding that section 1109 applies retroactively, the failure to bifurcate the trial of the gang enhancements was harmless error. In most instances, when an error is one of state law, reversal is not warranted unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. (*People v. Watson* (1956) 46 Cal.2d 818, 836-837; *People v.*

*Lewis* (2021) 11 Cal.5th 952, 973 ["Typically, when an 'error is purely one of state law, the *Watson* harmless error test applies.' "].)  Madrigal contends that the error was of constitutional dimension and must be reviewed under *California v. Chapman* (1967) 386 U.S. 18, 24, harmless beyond a reasonable doubt standard.

The now-existing requirement to bifurcate gang enhancements arises from a state-law statute (§ 1109), and a failure to follow section 1109 therefore constitutes an error of state law.  As *Tran* recognized, certain errors of state law may require the application of the *Chapman* harmless error standard if they rise to federal constitutional error under the due process clause by rendering the trial fundamentally unfair.  (*Tran, supra,* 13 Cal.5th at p. 1209, citing *People v. Partida* (2005) 37 Cal.4th 428, 439.)  However, like the defendant in *Tran*, Madrigal has not persuaded us that the failure to bifurcate the gang enhancement created a fundamentally unfair trial within the meaning of the federal due process clause.  (*Tran*, at p. 1209 [holding that "the prosecutor's use of the gang evidence here did not render the trial 'fundamentally unfair' "].)

As in *Tran*, having rejected the contention that the failure to bifurcate the gang enhancements rendered the trial fundamentally unfair, we apply the *Watson* harmless error standard.  (See *Tran, supra,* 13 Cal.5th at p. 1209.)  Under that standard, we conclude that there is no reasonable probability of a different outcome were the gang enhancements to be bifurcated from underlying charges.  Our Supreme Court has recognized that "evidence of gang membership is often relevant to, and admissible regarding, the charged offense.  Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.  [Citation.]  To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled ...." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1050.)

In this case, Madrigal's gang connection was relevant to his motive and intent in shooting Corona. Evidence concerning Madrigal's gang status and the gang's culture would help explain to the jury why Madrigal shot Corona when there was no apparent reason to shoot anyone. Moreover, the independent evidence of Madrigal's guilt is overwhelming. Surveillance cameras and witnesses all placed Madrigal at the scene, pointing his finger at Corona and then chasing him down in the truck and shooting at him from the truck window. Madrigal suffered no prejudice due to the fact that the trial on the gang enhancement allegation was not bifurcated.

## II.  INEFFECTIVE ASSISTANCE OF COUNSEL

Counsel for Madrigal filed a pretrial motion requesting gang experts be precluded from testifying about the facts underlying predicate offenses, which the prosecutor agreed to. However, counsel did not make a similar objection to certain evidence regarding police contacts with Madrigal, which Madrigal contends was above and beyond what was needed to prove his gang membership and was "irrelevant," "extraneous" and "highly prejudicial." We reject Madrigal's claim of ineffective assistance of counsel.

To prevail on an ineffective assistance of counsel claim, the defendant "must prove ' "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant." ' [Citation.] ' "A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' [Citation.] If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient." (*In re Crew* (2011) 52 Cal.4th 126, 150, citing *Strickland v. Washington* (1984) 466 U.S. 668, 697.)

The evidence to which Madrigal objects included police officers' testimony of Madrigal's presence when responding to calls involving brandishing a weapon, finding

ammunition during a probation search of his home, armed robbery, and a shooting, without more detail. An officer described finding a gun in a car where Madrigal was a passenger, and that Madrigal had admitted he knew of the gun's presence. And a police officer described an incident where Madrigal was helping carry a man who had been shot and Madrigal was uncooperative with the officer.

None of the above mentioned evidence was unduly inflammatory in comparison to the charged crime, which involved shooting a man in the back of the head from a moving vehicle. Moreover, the evidence was relevant to Madrigal's gang membership and whether the murder was committed in furtherance of or to benefit the gang.

Thus, the evidence elicited by the prosecutor was not subject to an exclusionary order nor was it clearly inadmissible as Madrigal suggests. In any event, counsel's failure to object did not amount to ineffective assistance. Whether or not an objection to any of the challenged evidence would have been sustained, there is no reasonable likelihood that the outcome of the trial would have been different had the evidence been excluded. The challenged evidence was only briefly mentioned without further detail. And, as mentioned in part I. of the Discussion, above, the evidence of Madrigal's guilt that he followed and shot an unarmed man while he was driving was overwhelming.

III. PROBATION REPORT FEE

Madrigal argues, and the People concede, that we must vacate the trial court's order imposing a presentence probation report fee because the statutory authority for imposing it has been repealed. We agree.

The trial judge ordered Madrigal to pay the costs of preparing a probation report under section 1203.1b, in the amount of $296 "within 30 days of release." Assembly Bill No. 1869 (2019-2020 Reg. Sess.) amended the Penal Code by adding section 1465.9, which provides, "On and after July 1, 2021, the balance of any court-imposed costs pursuant to Section … 1203.1b …shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Stats. 2020, ch. 92, § 62.)

20.

This provision requires us to vacate the order imposing such fee. (*People v. Clark* (2021) 67 Cal.App.5th 248, 260.)

## IV. RESTITUTION FINE

Madrigal contends the trial court erred when it imposed a $10,000 restitution fine over defense counsel's objection that he lacked the ability to pay and he seeks to have his restitution fine reduced to the statutory minimum of $300, pursuant to *People v. Duenas* (2019) 30 Cal.App.5th 1157 (*Duenas*).

Where a defendant has been convicted of a felony, the court is required to impose a restitution fine of between $300 and $10,000. (§ 1202.4, subd. (b).) The court must impose the minimum restitution fine of $300 without reference to the defendant's ability to pay. (§ 1202.4, subds. (b)(1) and (c).) However, "[i]nability to pay may be considered ... in increasing the amount of the restitution fine in excess of the minimum fine" of $300. (§ 1202.4, subd. (c).) The statute specifies that the defendant "bear[s] the burden of demonstrating [his or her] inability to pay" and that "[a] separate hearing for the fine shall not be required." (§ 1202.4, subd. (d)).

In *Duenas*, Division 7 of the Second Appellate District held that due process requires the trial court to stay execution of any restitution fine unless and until it holds an ability-to-pay hearing and concludes that the defendant has the ability to pay the restitution fine. (*Duenas, supra,* 30 Cal.App.5th at p. 1164.)

During the sentencing hearing, Madrigal's defense counsel noted that Madrigal would be in prison "for a very, very, very long time," and asked the trial court "to suspend all fines and fees … for the reason[] that he'll have an inability to pay, and that goes for attorney's fees as well." The trial court agreed Madrigal lacked the ability to pay attorney fees, but imposed a restitution fund fine of $10,000 and victim restitution of $7,500.

On appeal, Madrigal argues he is unable to pay the $10,000 restitution fund fine, citing the low wages and limited jobs prison would provide. Thus, the trial court made an

ability to pay finding based on Madrigal's future earning capacity. We review that factual determination for substantial evidence. (*People v. Nilsen* (1988) 199 Cal.App.3d 344, 347.)

Madrigal was 26 years old at the time of sentencing. He was employed at the time he shot and killed Corona, and there is nothing in the record to indicate Madrigal is not able-bodied or is unable to physically work. Nor did Madrigal present any such evidence.

"Wages in California prisons currently range from $12 to $56 a month. [Citations.] And half of any wages earned (along with half of any deposits made into [a defendant's] trust account) are deducted to pay any outstanding restitution fine." (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.) Even at the highest prison wage and with half of his earnings applied towards his restitution fine, it would take Madrigal about 30 years to pay his restitution fund fine. While this is a significant amount of time, it is less than his life without the possibility of parole sentence, and the trial court was reasonable in concluding Madrigal failed to carry his burden to "present evidence of his … inability to pay." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1062 [defendant sentenced to 82 years to life had ability to pay $10,600 in restitution fines, $160 in court operations assessment, and $120 in court facilities funding assessments].)

Madrigal also claims that, because the trial court found an inability to pay attorney fees, he necessarily also had the inability to pay the $10,000 fine. However, a finding of inability to pay attorney fees does not demonstrate that a defendant is unable to pay his restitution fine. "[A] defendant may lack the 'ability to pay' the costs of court-appointed counsel yet have the 'ability to pay' a restitution fine." (*People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397.) Former section 987.8 (repealed effective July 1, 2021) defined an ability to pay in the context of attorney fees and indicated that such a determination was based on a defendant's present financial condition. (Former § 987.8, subds. (b),

(g)(2).)  In contrast, courts have uniformly recognized that a defendant's probable future wages, prison or otherwise, can be considered when determining an ability to pay a restitution fine.  (*People v. Aviles, supra,* 39 Cal.App.5th at p. 1076.)

For the foregoing reasons, Madrigal has not demonstrated that the court erred in imposing the $10,000 restitution fund fine.

## DISPOSITION

We vacate the true findings and strike the sentences imposed under section 186.22, subdivision (b), section 12022.53, subdivision (e)(1), and section 190.2, subdivision (a)(22), and remand the matter to afford the People the opportunity to retry these allegations in conformance with the current law.  We also vacate the probation fee.  The judgment is otherwise affirmed, including the first degree special circumstance murder conviction (§§ 187, subd. (a); 190.2, subd. (a)(21)) and true finding that Madrigal personally and intentionally discharged a firearm that proximately caused death within the meaning of section 12022.53, subdivision (d).

FRANSON, J.

WE CONCUR:


LEVY, Acting P. J.


MEEHAN, J.